[Crim. No. 1090.  Second Appellate District, Division Two.—March 19, 1924.]

In the Matter of the Application of DAGMAR E. TAYLOR for a Writ of Habeas Corpus.

[1] CRIMINAL LAW—RECEIVING STOLEN GOODS—KNOWLEDGE OF THEFT —EVIDENCE.—In this proceeding on *habeas corpus* to secure the release of petitioner from custody under commitment made pursuant to an order binding her to answer to a charge of receiving stolen goods, although the evidence showed that petitioner had in her possession a watch that had been taken by robbers from the manager of a loan association, the testimony of the officers who searched her place and found the watch did not show that she had received it with knowledge of the fact that it had been stolen, and there was nothing in the remarks and inquiries of the officers and petitioner's responses justifying the inference that she received the watch with knowledge of such fact.

(1) 29 C. J., p. 47, sec. 38.

PROCEEDING in Habeas Corpus to secure the release of petitioner from custody under a commitment upon a charge of receiving stolen goods. Petitioner discharged.

The facts are stated in the opinion of the court.

S. S. Hahn for Petitioner.

C. W. Ostrom for Respondent.

WORKS, J.—Petitioner is detained by the sheriff of Los Angeles County under commitment made pursuant to an order binding her to answer to a charge of receiving stolen goods. Petitioner contends that she is imprisoned without probable cause. Section 496 of the Penal Code fastens the crime of receiving stolen goods upon ''Every person who for his own gain, or to prevent the owner from again possessing his property, buys or receives any personal property, knowing the same to have been stolen.'' The point made by petitioner is that she was committed without evidence showing that an article received by her, a certain watch, was taken with guilty knowledge.

1.  See 17 R. C. L. 85.

[1] The evidence before the committing magistrate showed that the watch in question, along with a considerable number of other articles of jewelry, was taken by robbers from a manager of a "loan association." Upon an occasion after the robbery three peace officers, Cahill, Peoples, and Sweesey, called upon petitioner at the apartment which was her place of residence. The testimony of these men, given in the order in which their names are set forth above, contains the only evidence bearing upon the point presented by petitioner. Cahill was asked who conducted the conversation with petitioner which ensued upon their call at her apartment. He answered: "I was the one that done the first questioning." He then proceeded: "Deputy Sheriff Peoples was immediately present. I dare say Mr. Sweesey was in the other room at the time. . . . I asked the defendant if she had any jewelry that had been left her by Jimmie Blanton, and she said, 'What is it all about? Tell me something.' And I said, 'Well, you are evidently very conversant with what we are trying to get you to help us in.' I said, 'We are looking for the jewelry that you have in your possession,' and I said, 'The easier way is the better way, and we would solicit at this time your co-operation and expedite matters, if the jewelry is here, and save us the trouble of going about and searching for it.' I said, 'We know, or feel that we know where Jimmie is.' I said, 'Did you have a telegram from San Francisco with regard to his coming to-day?' 'Well,' she said, 'I know they are out of the city and due to-day.' I said, 'Then, what became of the jewelry that Jimmie gave you?' She said, 'It is not here.' Then I said, 'Now, I am going to appeal to you again to lend us your co-operation.' I said, 'We are certainly working diligently on this case, and we want to expedite matters, and if you have the jewelry hidden in this house, kindly turn it over and cause us less trouble in searching.' She said, 'No, it is not here.' Then I said, 'Will you take us to where it is? Is it in a safety deposit box?' 'Well,' she said, 'I am not saying.' I said, 'Then what is Jimmie to you?' She said, 'He is my husband.' And I said, 'Then do you expect him to-day?' And she said, 'Well, I am expecting him.' . . . Peoples was present during that conversation. Then we started to look through the dresser drawers. I said, 'If you don't go about and

do this,' I said, 'we will go ahead and look for the jewelry in the drawers, that meeting with your approval.' And she said, 'Go ahead.' . . . Q. Now, was Officer Sweesey present when you asked permission to search the house? A. Yes; he had come in at that time.'' The officers then proceeded with a search and Cahill found a small bar pin which, it is to be observed, was not one of the articles of jewelry taken by the thieves from the manager of the loan association. Cahill further testified: ''Mr. Sweesey at this time was looking through the left and upper drawer of the same dresser, and I turned to the defendant and asked her if that little bar pin was hers. She said, 'Yes, that is mine.' I said, 'Where did you get it?' She said, 'From a friend.' Then I was attracted by Mr. Sweesey asking a question. He had raised a little watch out of the drawer and asked the defendant if that was her watch . . . and she stated, 'Yes.' Now, that was all the jewelry that we were able to find.'' Peoples testified that he talked with petitioner after Cahill's conversation with her. After some questions about other matters, Peoples further said: ''Mr. Sweesey was present at one conversation, rather through the latter part of it. I was talking with her before, and I said, 'Won't you please tell me where those diamonds are?' I said, 'I know you have got some rings and diamonds, and I would like to get them.' She said, 'I don't know anything about them.' I said, 'Don't you think it would be better if you tell us and clear this matter up and save us a lot of trouble?' She said, 'I am not telling nothing.' Just then Mr. Sweesey came up and he started talking about the watch, so she said, 'In just a few moments Mr. Peoples. I would have told them.'' Sweesey testified very briefly. He said upon the subject of present interest: ''The only conversation I had I picked up the watch and asked who that belonged to, and I do not remember the answer. . . . I addressed it to the defendant, but I do not remember the answer.''

Respondent contends that it may be inferred, with reason, from certain answers and remarks which petitioner made in response to the inquiries of the officers, that she received the watch with knowledge of the fact that it had been stolen. The utterances of petitioner to which this effect is ascribed are these: ''What, is it all about? Tell me something''; ''It is not here''; ''No, it is not here''; ''well, I am not

saying''; ''I don't know anything about them''; and ''I am not telling nothing.'' It is asserted that as the watch was in fact part of the stolen jewelry, petitioner's answers, being evasive and calculated to deceive, as it is claimed, were such as to justify an inference of guilty knowledge on her part as to that particular article. We think that such an inference cannot properly be drawn from her statements. Cahill, who first talked with her, spoke only of jewelry in general. Peoples, the next inquisitor, was more specific and referred to diamonds and rings. The conversation about the watch came later. If the officers had found in petitioner's possession diamonds and rings which were a part of the missing loot, then some tangible question would be presented as to whether petitioner's utterances were so evasive and so calculated to deceive as to justify the inference that her possession of them was coupled with a guilty knowledge. This is not so as to the watch. There was nothing in the remarks and inquiries of the officers which can render her responses applicable to that piece of jewelry, granting that they were evasive and deceitful as to jewelry consisting of diamonds and rings. In addition to all that we have said it is also to be observed that the officers failed to make petitioner acquainted with the fact that they were seeking stolen goods, except in so far as she might have inferred the fact from their conduct. Further, they never told her that there had been a theft, either by Jimmie Blanton or by any other persons. Further still, although the record before us shows that the manager of the loan association was robbed by several men, there is nothing in the evidence to indicate that Blanton was among the lawbreakers or that he had any connection with their criminal act.

Petitioner is discharged.

Finlayson, P. J., and Craig, J., concurred.